IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| CARIBBEAN AIRPORT FACILITIES, INC.<br><br>Plaintiff<br><br>vs<br><br>BERNARDO VAZQUEZ, Executive Director of the Puerto Rico Ports Authority; DAVID ALVAREZ, Executive Director of the Puerto Rico Public-Private Partnerships Authority<br><br>Defendants | CIVIL 12-1032CCC |

**OPINION AND ORDER:
STATEMENT OF REASONS**

Plaintiff Caribbean Airport Facilities, Inc. (CAF) is a tenant of defendant Puerto Rico Ports Authority (PRPA) pursuant to an October 24, 1988 lease agreement, twice amended, under which CAF leased certain undeveloped land in the Luis Muñoz Marín International Airport (Airport), agreed to make substantial monetary investments to construct cargo and passenger services facilities in the leased premises and would receive credits against the lease payments due to PRPA under the lease agreement pursuant to an agreed credit reimbursement formula.[1]  See ¶¶ 28-31, 37 of the Complaint.[2]  Plaintiff estimates the current value of the credit reimbursements for the investments it has made at the Airport in the sum of $50,989,575.24.  Id., at ¶ 34.

Allegations 18 through 26 of the complaint set the stage for the principal events which underlie plaintiff's claims for declaratory and injunctive relief:

> 18. Recently, the United States Congress authorized the development of several airport projects as part of Public-Private Partnerships (PPP), all

---

[1] Extensive references to a judgment incorporated into a settlement stipulation filed in a 1990 case between CAF and PRPA in this Court, Civil No. 90-2271(HL) have little, if no relevance, to the claims made by plaintiff in its complaint, other than as historical background.

[2] The initial agreement and its amendments were executed as deeds and recorded at the First Section of the Property Registry in the Municipality of Carolina.  See opinion of the Puerto Rico Court of Appeals (docket entry 59-1), at p. 2, n. 1.

19. of which needed to be approved by the FAA, under what is known as the "Pilot Program."

20. The Pilot Program was authorized by Section 149 of the Federal Aviation Administration Authorization Act of 1996, as amended by Section 155 of the Vision 100 Century of Aviation Reauthorization Act of 2003, 49 U.S.C. § 47134.

20. The Pilot Program is a program regulated by the FAA and developed with federal aid . . .

21. Under the Pilot Program the FAA may approve the concession of up to five "public use" airports in the United States. Only three (3) of these airports may be "medium hub airports" . . . such as the Luis Muñoz Marín International Airport.

22. <u>The PRPA filed a preliminary application under the Pilot Program and this application was accepted for review by the FAA on December 22, 2009</u>.

23. <u>In order to qualify for the FAA Pilot Program, the PRPA is structuring a PPP Contract and a Use Agreement with the airlines to ensure, among other conditions, that: (i) the airport will continue to be available for public use without unjust discrimination; (ii) the contractor will maintain, improve and modernize the Airport facilities through capital investments; (iii) Airport fees imposed on air carriers will not increase faster than inflation</u> . . .

24. <u>In addition to these requirements, in order for the PRPA to participate in the Pilot Program, the FAA Administrator must find that the transfer of the Airport to a successful proponent, under a PPP, will not result in unfair or deceptive trade practices or unfair methods of competition, and that the interests of general aviation users are not adversely affected</u>.

25. <u>The PRPA has determined that it will receive substantial upfront net profits associated with the long term lease of the Airport under the Pilot Program that exceed $100 million; thus, improving its financial capacity, reduce indebtedness and improve the financial profit of the Airport</u>.

26. <u>In June 2010, the PRPA published a request for qualifications ("RFQ") and is in the process of selecting a qualified entity to whom it would lease the Airport</u>.

Emphasis ours.

Plaintiff's claims are linked to the LMM Airport project as a Public-Private Partnership under the Pilot Program at allegations 27 and 41 of the complaint:

27. Since October 29, 2009 and to further its interest in transferring the Airport operation to a third party under the Pilot Program, the PRPA has engaged in attempts to acquire CAF leasehold rights and interests in the Airport, which are reasonably estimated in the sum of $97,500,000.00,

CIVIL 12-1032CCC                              3

> and the parties have been in regular and constant negotiations and communications in this regard.
>
> 41. On January 2012, the Executive Director of the PRPA, in conjunction with Mr. David Alvarez, Executive Director of the PPP initiative, informed CAF's of the government's intention of taking its leasehold interests without compensating CAF for the value of the credits.

At paragraph 42, it is alleged that the two defendants "are furthering the PRPA's purpose of taking CAF's private property without paying a fair compensation in violation of the Takings Clause of the Fifth Amendment of the United States' Constitution, as extended to the States by the Fourteenth Amendment, which limits the power of eminent domain by requiring that 'just compensation' be paid if private property is taken for a public use." Paragraphs 47 and 48 are significant with regard to the lack of just compensation claim for there it is alleged that PRPA has failed to give any value to the $50,900,000 rent credits established in the lease agreement, as amended (see ¶ 47), that the defendants ceased negotiations on December 18, 2011, had already published in June 2010 a request for qualifications (RFQ) (see ¶ 26) and is in the process of selecting a qualified entity to whom it would lease the Airport (see ¶ 48).

Plaintiff goes on to incorporate its first 48 allegations in support of the following causes of action: (1) due process under the Constitution of the U.S. and Puerto Rico, "in that defendants have seized and attempt to seize and confiscate CAF's property without adequate process and in a grossly abusive process which is shocking to the conscience" (see ¶ 50), (2) that the taking of CAF's rights is in violation of the requirement that "takings be for legitimate public purposes and not for the purpose of conferring a private benefit on particular parties" (see ¶ 51), and (3) defendants actions violate the Contract Clause of the U.S. Constitution "which prohibits the States from impairing contractual obligations, as the contractual rights of CAF have been affected by the arbitrary seizure of its right to use contractual credits against lease payments pursuant to the Lease Agreement between CAF and PRPA" (see ¶ 52).

CIVIL 12-1032CCC                                      4

Plaintiff seeks judgment declaring Law 29 enacted on June 8, 2009 unconstitutional and enjoining the individual defendants in their official capacities, "as the implementors and enforcers of Law No. 29 which illegally and unconstitutionally allows for the transfer of property and contract rights involving the PRPA to private-public partnerships, disregarding CAF's existing contract rights with the PRPA."  Complaint, at ¶ 4.

Defendant David Alvarez (Alvarez), Executive Director of the Puerto Rico Public-Private Partnership Authority (PPPA), filed a Fed. R. Civ. P. 12(B)(6) Motion to Dismiss (**docket entry 11**), later joined by co-defendant Bernardo Vazquez (Vázquez), Executive Director of the Puerto Rico Ports Authority (PRPA) (docket entry 12).  Alvarez contends that the complaint does not comply with the Ashcroft v. Iqbal[3] plausibility standard of pleading and, as to the specific causes of action (Due Process, Contract Clause, taking without just compensation) cites cases which would defeat these claims.  We quote relevant portions of plaintiff's opposition (docket entry 41, originally filed as docket entry 13-1) which give insight into plaintiff's constitutional challenge to Law 29 and the exercise by the Commonwealth of Puerto Rico of its power of eminent domain as a means of achieving the objectives of such statute in the context of the public-private partnership of the Airport. Examples of these are the following:

> Simply stated, the government of Puerto Rico, exercising an action tantamount to those seen in dictatorial regimes, has decided to set aside its contractual obligations with CAF through the use of its constitutional eminent domain powers to take private property . . . precisely because there is a contract between the Ports Authority and CAF, it follows that the Ports Authority cannot ignore its contractual obligations using its eminent domain power.

Opposition, at p. 11.

> In this case, CAF alleges that the PRPA's and PPP (referring to the private-public partnership of the Airport) decision not to compensate CAF for the PRPA's rent credits agreed with CAF  constitute[s] a confiscation of property in violation of the Takings Clause of the Fifth Amendment.

Opposition, at p. 19 (emphasis ours).

---

[3] 556 U.S. 662 (2009).

CIVIL 12-1032CCC                              5

> CAF is challenging the constitutionality of defendants' executive acts (the taking of CAAF's contract rights with no compensation) which are so egregious that not only shock the conscience of anyone in a democracy but deprive CAF of its property interest in the contract rights. It is unconscionable for the government to enter into a lease agreement that requires a private party such as CAF to make multi-million dollar investments in developing raw, unused government land in exchange for rent credits proportionate to the investment made and then not having cause to terminate the lease agreement and after the investment is made by the private leaseholder, have the government use its eminent domain power to take the contract rights from the private party and transfer the title of the property developed to another private party, <u>such as is the objective of the PP initiative. This type of government action cannot be tolerated in a democratic society as it not only allows the government to do away with its contractual obligations, but also allows the government to exercise its constitutional powers to annihilate the rights of private parties and make them its own</u>.

Opposition, at pp. 25-26 (emphasis ours).

> The Complaint filed by the Commonwealth to take CAF's contract rights is not based on suspicion; it is a reality . . . they are furthering PRPA' purposes of taking CAF's contract rights through the use of the government's eminent domain power . . . their conduct was intentional, grossly negligent, or, at least, amounted to a reckless or callous indifference to CAF's constitutional rights.

Opposition, at p. 30.

Defendant Alvarez filed a reply (docket entry 20) and addressed the takings claim stating that given "the existence of a previous pending eminent domain proceeding . . . CAF has state remedies available because there is already a judicial action concerning the expropriation of CAF's property [and] whatever compensation is due . . . should be litigated in that pending state court proceeding." Reply, at p. 14. Co-defendant Vázquez filed a separate reply (docket entry 22) where it cites <u>Williamson County Regional Planning Comm'n v. Hamilton Bank</u>, 473 U.S. 172, 105 S.Ct. 3108 (1985), and raises the argument that a Takings claim ordinarily is considered unripe if the claim is brought directly to federal court without first exhausting available state remedies.

While the dismissal motion filed by both defendants was pending, plaintiff filed a motion to stay of all proceedings on November 27, 2012 (docket entry 53), opposed by defendant Alvarez (docket entry 55), which has been rendered moot due to the fact that it has not been disputed, as informed at docket entry 63 by intervenor Ivyport Logistical

CIVIL 12-1032CCC                                            6

Services, Inc. (Ivyport), plaintiff's sub-lessor of part of the Airport facilities subject to condemnation, that the pending certiorari petition before the Supreme Court was withdrawn by the Commonwealth of Puerto Rico on February 7, 2013, thereby allowing continuation of the eminent domain proceedings before the Court of First Instance, Superior Court of San Juan.  The Court, however, deems it relevant to take judicial notice of the August 30, 2012 judgment of the Court of Appeals of the Commonwealth of P.R., San Juan judiciary region, for it provides a complete narrative of the status of the expropriation proceedings brought by the Commonwealth "to acquire certain leased rights on lands owned by the Puerto Rico Ports  Authority located at the Luis Muñoz Marín International Airport and which Caribbean Airport Facilities, Inc. holds as lessee."  <u>See</u> certified translation of August 30, 2012 Judgment (docket entry 59-1), at p. 1.

      Against this backdrop, the Court reaches its determination regarding the dismissal motion and plaintiff's arguments in opposition.  The plausibility of the claims against defendants Alvarez and Bernardo Vázquez in their official capacities as Executive Director of the Puerto Rico Public-Private Partnership Authority (PRPPPA) and as Executive Director of the PRPA, respectively, must be assessed in the context alleged by plaintiff of their roles as "the implementors and enforcers of Law No. 29 of June 8, 2009 which illegally and unconstitutionally allows for the transfer of property and contract rights involving the PRPA to private-public partnerships . . . disregarding CAF's existing contract rights with PRPA."  <u>See</u> ¶ 4 of the Complaint.  Plaintiff seeks a judgment declaring Law No. 29 unconstitutional, as implemented by defendants.  This Law is officially known as the Public-Private Partnerships Act.  The implementation of that law by the defendants was done in the context of a specific project, that of the Airport pursuant to a public-private partnership contract executed by PRPA as a Participating Governmental Entity and a qualified proponent pursuant to the requirements of Law 29.  In its statement of motives, the statute acknowledges that due to the grave fiscal situation confronted by the government of Puerto Rico, both the central government and its public corporations such as the Ports Authority,

CIVIL 12-1032CCC				7

several of these public corporations lack the resources to operate and the capacity to refinance their debts or obtain financing for their improvement programs. It describes the fiscal situation of public corporations in Puerto Rico as alarming and the need, among others, to obtain funds to cover their operational expenses. The government acknowledges that traditional alternatives for the development, construction and infrastructure maintenance are no longer viable and that it has the urgent need to search for creative alternatives to strengthen its credit, free its capacity to obtain financing and to ensure the continuing development of new public interest projects which include, among others, the construction of new installations, the maintenance of existing ones and the need to provide essential services. The statute defines the Public-Private Partnership (PPP) as an efficient mechanism to reinforce the Puerto Rican economy and describes these as the establishment of alliances by the State with the private sector which have prove successful in other countries, such as the European Community, in relieving the public sector of part of the investment required in providing goods and services.

The following definition of a PPP, the public purpose behind its establishment and the requirements are set forth in the following terms:

> A Public-Private Partnership is an entity that couples the resources and efforts of the public sector with resources of the private sector by means of a joint investment that results in the benefit of both parties. Such Partnerships are sought with the purpose of providing a service for citizens, as well as building or operating a facility or project that is held in high priority by the Government, be it due to the urgency, the need or convenience for the citizens. These Partnerships shall be vested in high public interest, that is, the Commonwealth is neither relinquishing its responsibility of protecting such interest, nor waiving its rights to receive an efficient service, nor renouncing to the ownership of the public assets included into the Partnership Contract.

The statute goes on to require that the establishment of PPPs have a judicial and administrative setting that includes procedures that foster transparency in the development of the project and that such procedures must promote competition in the request for proposals and make information available in order to attract the best proponents. The Act specifically states that its purpose is to establish a new public policy and to provide a legal

CIVIL 12-1032CCC                                 8

framework that promotes the use of the public-private partnership as a development strategy, maintaining the necessary control to protect the public interest harmonizing this with the profit objective of private enterprise. The contractual relationship established between the public and private sector are viewed in the Act as mutually beneficial while simultaneously guaranteeing that goods and public services be provided in an efficient manner, accessible to the entire citizenry. The Act creates the Authority for the Public-Private Partnerships of Puerto Rico, which in turn designates a Partnership Committee to evaluate and select the proponents of a partnership and to establish and negotiate the terms and conditions that it deems appropriate for a particular partnership contract. The statute defines a partnership contract as one executed between a proponent who has been selected by the Public-Private Partnership Authority and the participating governmental entity to establish a partnership which can include but is not limited to administering services, construction, financing, maintenance or operation of one or more facilities which are closely related to priority projects as established in Article 3 of the statute, which includes projects such as the construction, operation or maintenance of any type of transportation systems, including maritime or air transportation. A partnership contract pursuant to Article 2(g) of the statute can include long-term lease agreements, among other types of contracts. Article 3 declares as public policy of the government of Puerto Rico to (1) promote the establishment of public-private partnerships for the creation of such priority projects, (2) promote the development and maintenance of infrastructure facilities sharing the risk posed by the development, operation and maintenance of such projects between the State and the contracting party, and (3) to improve the services provided, create employment and promote the socio-economic development and competitiveness of Puerto Rico. Article 4 of the statute authorizes every governmental entity, including a governmental entity which is a public corporation, to voluntarily participate in establishing partnerships and executing partnership contracts regarding any function, service or installation for which it is responsible pursuant to the provisions of its enabling act.

CIVIL 12-1032CCC                                9

It is within the authority of this statutory framework, that PRPA established a public-private partnership in a contract executed with an approved proponent for the long-term lease of the Airport, pursuant to which PRPA "has determined that it will receive substantial up front net profits associated with the long term lease of the Airport under the Pilot Program that exceed $100 million; thus, improving its financial capacity, reduce indebtedness and improve the financial profile of the Airport."  Complaint, at ¶ 25.

In its motion for stay of all proceedings (docket entry 53), plaintiff gives the reason for filing this lawsuit:  "[t]his complaint was filed for the steps that defendants took to take CAF's property and interests without paying a just compensation, <u>including the December 28, 2011 expropriation case filed by the Commonwealth of Puerto Rico against CAF in the case of Estado Libre Asociado de Puerto Rico vs. Caribbean Airport Facilities, Inc, et. al, KEF2011-0453, among others</u>."  (<u>Id</u>. at ¶ 2; emphasis ours.)  The details of the expropriation petition are set forth in the August 30, 2012 judgment of the Court of Appeals of Puerto Rico which was submitted by plaintiff, duly translated, at docket entry 59-1.  On that date, the Commonwealth of Puerto Rico exercised its power of eminent domain when, on behalf of the PRPA, it "filed an expropriation petition for acquisition under eminent domain of the rights of respondent Caribbean Airport Facilities Inc., according tor the terms of certain lease agreements entered into between the Authority, as lessor, and Caribbean, as lessee.  By this means the Authority was to recover possession of the leased property, free of any charge or encumbrance related to the lease agreements, as well as the improvements, facilities, and structures built under such lease agreement, that the Commonwealth described and listed in Exhibit A joined to the petition."  Docket entry 59-1, at p. 2.

The Court of Appeals of Puerto Rico referred to the public purpose declared by the Commonwealth in its petition, stating the following:

> As set forth by the Commonwealth, the expropriation under eminent domain
> of these rights was useful and necessary for "the improvement and financing
> of the Luis Muñoz Marín International Airport, in accordance with the goals

>   and purpose of the Authority and for the benefit of the Airport facilities, the economy of Puerto Rico in general, and the Puerto Ricans who use the Airport." The public use thus expressed by the Commonwealth would be achieved through said expropriation and the creation and concession of a public-private partnership that "would finance, operate, maintain, and improve the airport."

Id., at pp. 2-3. Regarding the compensation requirement, the appellate court observed that "along with the expropriation petition, the Commonwealth deposited with the Court the amount of $25,350,679, estimated as just value of the rights to be expropriated" and that "[t]his amount also included certain construction credits owed to Caribbean and the value of the income Caribbean obtained from the sub-lessees."[4]  Id., at p. 3.  It commented that the Commonwealth in its petition of expropriation asked the Court of First Instance "to retain approximately $14.5 million dollars from the amount deposited as just compensation and to place such amount in an escrow account to cover the alleged contamination that Caribbean supposedly caused on the lease property."  Id., at p. 3.  At page 5 of its judgment, the Court of Appeals also notes that the Court of First Instance had ordered the Commonwealth to serve notice to all of the interested parties identified in the petition of expropriation.  Plaintiff has not disputed that it received notice of the expropriation proceeding and has participated in it.

The Court of Appeals concluded that the Statement for the Acquisition and Material Delivery of the Property submitted by the Commonwealth of Puerto Rico in the expropriation proceedings complied with the requirements of the Expropriation Act, 32 L.P.R.A. § 2907 "since in the Statement the legal grounds authorizing the expropriation of the rights in question were set forth, as well as the public interest that motivated the expropriation . . . and also described with sufficient specificity the rights to be expropriated, to wit, all of the rights derived from the lease agreements entered into with Caribbean." Id., at p. 13. It also

---

[4] The appellate court noted in its Judgment at page 2, footnote 2, that the Commonwealth directed its expropriation against the property that was subject to the lease agreements between the Authority as lessor and CAF as lessee and some 32 sub-lessees of Caribbean, among them Ivyport Logistical Services, Inc, which is an intervenor in this case.

CIVIL 12-1032CCC                                11

noted "that the public funds that are deposited in expropriation cases are never more than an 'estimate' of what the expropriating entity considers in a preliminary and unilateral matter to be 'just compensation,'" that "[t]he final amount to be set, whether a greater or lesser amount than that which was deposited originally, is always a judicial exercise" and "[t]herefore, as an inherent and essential part of its functions in these proceedings, the forum of first instance could require the Commonwealth to deposit the real amount that the appraisers had estimated as just compensation in this case." We do not have to unravel the issues which led to this appellate ruling and to a subsequent petition for certiorari by the Commonwealth before the Supreme Court of Puerto Rico, recently withdrawn. What is significant to our case is that, upon finding that the original Statement of Acquisition submitted by the Commonwealth and the deposit of the estimated amount of just compensation were made in accordance with the Expropriation Act, the appellate court determined that "these actions have the automatic effect of transferring to the Commonwealth the title of the rights being sought." Id., at p. 14. At this stage of the expropriation proceedings, that is the law of the case and such is the current status of those proceedings. As reported in the unopposed Informative Motion (docket entry 63), the expropriation action returns to the Court of First Instance, Superior Court of San Juan for further proceedings.

We now assess the plausibility of the various constitutional claims alleged, i.e., Due Process, Takings Clause and Contract Clause, in light of the underlying legal principles. For purposes of clarity, before embarking on that analysis, we quote from that part of plaintiff's complaint where it more specifically defines what type of Injunctive and declaratory relief it seeks:

> In particular, CAF seeks that this Honorable Court enter a preliminary and permanent injunction enjoining co-defendants, Mr. Bernardo Vázquez and Mr. David Alvarez, from exercising any act that would take CAF's property interests, including its leasehold improvements, over the investments it made to develop its property in the Luis Muñoz Marín International Airport . . . and/or from preventing the use of the credits granted to CAF for the investments made, and also to declare that CAF is entitled to receive the reimbursement,

CIVIL 12-1032CCC                              12

>    pursuant to the contract between the parties as incorporated in a judgment entered by this Court, for all the investments it made, plus interest at 9.5%, by way of construction costs and mitigation expenses which total the sum of $35,100,000.00.  In this civil action, CAF also seeks a preliminary and permanent injunction enjoining co-defendants, Vázquez and Alvarez, from implementing Puerto Rico Law No. 29 of June 8, 2009, as amended, in a manner that would violate Section 10, Article I of the United States Constitution.  By ignoring CAF's contractual rights with the PRPA, co-defendants Alvarez and Vázquez, are allowing, and have informed CAF, will continue to allow the impairment of the existing contract between CAF and the PRPA, all to the detriment of CAF's property interests and in violation of the United States Constitution.

Complaint (docket entry 1), at ¶ 12, pp. 5-6.

There is no mention in this statement of any concrete factual allegations in support of a due process violation.  There are general references sprinkled in the complaint, such as the following:

>    . . . the patent violation of the rights of CAF, through the actions of defendants in furtherance of a law enacted on June 8, 2009, have arbitrarily and unilaterally seized the title to property belonging to CAF, actions which constitute a gross violation of the due process rights of CAF.

Complaint, at ¶ 1, pp. 1-2.

>    The actions set forth herein deprive CAF of its rights to property, in violation of the constitutional guarantees of substantive and procedural due process under the Constitutions of the United States and of Puerto Rico, in that the defendants have seized, and attempt to seized and confiscate, CAF's property without adequate process and in a grossly abusive process which is shocking to the conscience and contrary to the crux of the aforementioned constitutional guarantees.

Complaint, at ¶ 50, p. 14.

In its opposition to dismissal (docket entry 41), at page 11, it simultaneously avers that "both defendants, as public officials, <u>notified CAF of the government's decision to exercise its constitutional power to take property</u>" and that "the government of Puerto Rico, exercising an action tantamount to those seen in dictatorial regimes, has decided to set aside its contractual obligations with CAF through the use of its constitutional eminent domain power to take private property."  It characterizes the government's actions as "undemocratic."

CIVIL 12-1032CCC                                    13

It is clear from the expropriation proceedings pending before the Court of First Instance of Puerto Rico that the Commonwealth exercised its power of eminent domain to advance the objectives of Law 29 in the specific context of creating a public-private partnership between the PRPA as a governmental entity and a qualified contractor for purposes of operating the Airport. Plaintiff acknowledges the Commonwealth's power of eminent domain by referring to it as the "constitutional power." That power was found by the Court of Appeals of the Commonwealth to have been validly exercised in compliance with the statutory requirements of the Expropriation Act in a proceeding in which plaintiff was notified and given the opportunity to be heard.

There is, thus, no basis for a procedural due process challenge to defendants' actions in their official capacities. What plaintiff reiterates throughout its complaint and opposition to dismissal is that the exercise of the power of eminent domain was used to violate its contractual rights under the lease agreement with PRPA. Its constitutional challenge to Law 29, as implemented by defendants, lacks foundation. Law 29 establishes a well-defined statutory scheme for the creation of public-private partnerships as an instrument to stimulate the business sector, cooperative unions and other entities from the non-governmental sector to establish initiatives that facilitate their participation in new spheres of activity. The Act, in its statement of motives, declares that "Public-Private Partnerships lend major support to the economic development of the Island and to the growth of local businesses." As mentioned earlier, the Commonwealth Legislature declared that the purpose of this Act is "to establish a new public policy and to provide the legal framework in order to promote the use of public-private partnerships as a development strategy." Within that legal framework, the Act provides for the creation of the Public-Private Partnership Authority with a Board of Directors and Partnership Committees which are the administrative mechanisms incorporated to fulfill its objectives. Its Section 6(a) establishes the powers of the Authority, among which is the right to grant "any kind of partnership contract." Section 6(b) designates the Authority as "the sole government entity authorized

and responsible for implementing the public policy on Partnerships as set forth in this Act and for determining the Function, Services or Facilities for which such Partnerships are to be established." Under section (6)(b)(i), the Authority has the task to "evaluate and select the Government Entities, Functions, Services and Facilities for Partnerships, conduct analysis as well as studies on the feasibility, desirability and convenience of the project as necessary to determine whether it is advisable to carry out the Project and establish such Partnership." See also section 7(b), which provides that as part of the study on desirability and convenience the Authority shall consider, among others, the economic and social impact of the Function, Facility or Service and the profitability of the Partnership, the social feasibility and the social impact of the proposed project, and the financial feasibility of the project or operation. It creates and approves regulations, open to comments from the public, that govern procedures leading to the establishment of Partnerships. See section 6(b)(ii). Pursuant to section 6(b)(iii), the Authority evaluates the terms and conditions of each Partnership's contract and makes recommendations in connection therewith to the Board of Directors of the Partnering Government Entity.

Law 29 does not address any particular Partnership contract. It does provide for the identification, evaluation and selection of the projects to be established as Pubic-Private Partnerships and addresses the provisions that could or should be included in public-private partnership contracts. In sum, this is a wide-ranging, encompassing statute that establishes in minute detail the legal and administrative framework within which the establishment of Public-Private Partnerships and Public-Private Partnership contracts are spelled out. It does not address, as claimed, any particular Public-Private Partnership contract, nor does it contain any provision related to the exercise of the Commonwealth's eminent domain power. Such power, as discussed below, may be used by the government as a means to achieve the objectives of the Act, as needed, in particular PPP projects.

Plaintiff's position rests on the assumption that it has a due process protected interest to its contractual rights under the lease agreements with PRPA which overrides the creation

CIVIL 12-1032CCC                                      15

of Public-Private Partnerships and Public-Private Partnership contracts under Law 29. Based on this assumption, it raises substantive due process concerns at paragraph 50 that "CAF has been deprived of its right to property in violation of the constitutional guarantees of substantive and procedural due process under the Constitutions of the United States and of Puerto Rico in that the defendants have seized and attempt to seize and confiscate CAF's property without adequate process and in a grossly, abusive process which is shocking to the conscience and contrary to the crux of the aforementioned constitutional guarantees." In its opposition to dismissal (docket entry 41), it characterizes defendants' conduct as officers of the government of Puerto Rico as "an action tantamount to those seen in dictatorial regimes" (page 11) and as intolerable "in a democratic society" (page 26) because this action "not only allows the government to do away with its contractual obligations, but also allows the government to exercise its constitutional powers to annihilate the rights of private parties and make them its own" (page 26).

However, the state or sovereign exercises the power of eminent domain precisely to take property without the owner's consent, conditioned only upon the taking being for public use and upon making just compensation. That right is inherent to the government's very existence. In order to support a substantive due process claim, the conduct on the part of state officials must be intended to injure in some way unjustifiable by any government interest in order for such official action to be likely to rise to the conscience-shocking level. County of Sacramento v. Lewis, 523 U.S. 833, 849, 118 S.Ct. 1708, 1718 (1998). The Court cites Daniels v. Williams, 474 U.S. 327, 331, 106 S.Ct. 662, 665 (1986), stating that "this guarantee of due process has been applied to deliberate decisions of government officials to deprive a person of life, liberty or property" (emphasis in original). The Court has acknowledged the decision in cases in which official conduct is egregious enough to state a substantive due process claim, pointing specifically to deliberate indifference to the medical needs of convicted prisoners or pretrial detainees. In Lewis it made a significant observation: that its "concern with preserving the constitutional proportions of substantive

CIVIL 12-1032CCC                                16

due process demands an exact analysis of circumstances before any abuse of power is condemned as conscious shocking." Lewis, 118 S.Ct. at 1718-19.

      The only circumstances alleged by CAF in support of its substantive due process claim is that the government officials exercised the power of eminent domain to avoid their contractual obligations under the lease agreement. None of the allegations of plaintiff's complaint rise to the "shock the conscience" standard of conduct. Plaintiff's allegations in support of this particular constitutional violation are inextricably intertwined with the contention that the power of eminent domain was exercised to deprive it of contractual rights in violation of the Contract Clause. Paragraph 52 of the complaint asserts that defendant's "actions violate the provisions of Article I, section 10, of the U.S. Constitution which prohibits the States from impairing contractual obligations, as the contractual rights of CAF had been affected b the arbitrary seizure of its right to use contractual credits against lease payments pursuant to the Llease Agreement between CAF and the PRPA." This argument was flatly rejected in Hawaii Housing Authority v. Midkiff, 104 S.Ct. 2321, 2330, n. 6 (1984), where the Court, citing United States Trust Co. v. New Jersey, 431 U.S. 1, 19, n. 16, 97 S.Ct. 1505, 1516, n. 16 (1977), stated that "[t]he Contract Clause has never been thought to protect against the exercise of the power of eminent domain."

      Plaintiff also points to violations to the Takings Clause of the Fifth Amendment. Allegations 42, 43, 44 and 46 of the complaint refer to a violation of the Takings Clause of the Fifth Amendment due to failure to adequately compensate plaintiff's private property rights. Allegation 51 invokes the requirement that takings be for legitimate public purposes, claiming that CAF's property rights have been taken for the purpose of conferring a private benefit on particular parties. Regarding the just compensation factor at page 16 of its opposition, plaintiff complains about PRPA's failure to give any value to the $50,900,000.00 rent credits established in the Lease Agreement. Regarding the lack of a public purpose, paragraph 4, page 3 of the complaint refers to Law No. 29 as one that "illegally and unconstitutionally allows for the transfer of property and contract rights involving the PRPA

CIVIL 12-1032CCC				17

to public-private partnerships, disregarding CAF's existent contract rights with the PRPA." And, at page 25 of its opposition, it argues that it is unconscionable for the government to enter into a lease agreement with CAF as a private party and after it made multi-million dollar investments, the government uses "its eminent domain power to take the contract rights from the private party and transfer the title of the property developed to another private party such as is the objective of the PPP initiative" (emphasis ours). The argument "taking from one businessman for the benefit of another businessman" was rejected in Berman v. Parker, 348 U.S. 26, 33, 75 S.Ct. 98, 102 (1954), and again in Kelo v. City of New London, 545 U.S. 469, 486, 125 S.Ct. 2655 (2005), in which the Court cited Berman, 348 U.S. at pp. 33-34: "The public end may be as well or better served through an agency of private enterprise than through a department of government– or so the Congress might conclude. We cannot say that public ownership is the sole method of promoting the public purposes of community redevelopment projects."

The Court made clear in Berman that when it deals with the police power of the State, it is "the Legislature, not the judiciary which is the main guardian of the public needs to be served by social legislation whether it be Congress legislating concerning the District of Columbia . . . or the States legislating concerning local affairs." It added that "[t]his principle admits of no exception merely because the power of eminent domain is involved" and at page 103 the Court in Berman added: "Once the object is within the authority of Congress, the right to realize it through the power of eminent domain is clear. For the power of eminent domain is merely the means to an end . . . . Once the object is within the authority of Congress, the means by which it will be attained is also for Congress to determine." Ten years later in Midkiff, 104 S.Ct. at 2329, the Supreme Court reiterated both the concept that the power of eminent domain is merely the means to the end and that once the legislature establishes the public purpose it alone determines the means to attain its objectives. Citing United States v. Gettysburg Electric R. Co., 160 U.S. 668, 680, 16 S.Ct. 427, 429 (1896), the Court summarized the matter stating: "The Court has made clear that it will not substitute

CIVIL 12-1032CCC                                    18

its judgment for a Legislature's judgment as to what constitutes a public use 'unless the use be palpably without reasonable foundation.'" To this, it added: "But, where the exercise of the eminent domain power is rationally related to a conceivable public purpose, the Court has never held a compensated taking to be proscribed by the Public Use Clause." Midkiff, 104 S.Ct. at 2329.  It elaborated on judicial deference to a Legislature's judgment of what constitutes a public use, observing that "[w]hen the Legislature's purpose is legitimate and its means are not irrational, our cases make clear that empirical debates over the wisdom of takings - no less than debates over the wisdom of other kinds of socioeconomic legislation - are not to be carried out in the federal courts," Id., at p. 2330, and clarified that "[t]he fact that a State legislature, and not the Congress, made the public use determination, does not mean that judicial deference is less appropriate."

      Plaintiff has not advanced any allegation or circumstance in this case that would justify that this Court not give due deference to the Puerto Rico Legislature's judgment establishing as public policy of the Commonwealth that public-private partnerships and public-private partnership contracts are instruments that serve the public interest and purpose of supporting the economic development of the Island.  The Legislature determined that public-private partnerships stimulate the growth of local businessess in new spheres of activity by providing an alternative at a time of fiscal crisis to improve the services rendered by the government, to facilitate the development, construction, operation and maintenance of infrastructure and to disencumber Commonwealth financial resources vis a vis the present fiscal crisis.  The Legislature understood that the public-private partnerships allow for the development of projects and the rendering of some services more efficiently and in a less costly manner by delegating the risk inherent to such development or service onto the party that is best capable of assessing and managing such risk.  See generally the Statement of Motives of the Act.  These statements of public need by the Puerto Rico Legislature are not irrational.  Neither has plaintiff alleged that this public purpose declaration is without reasonable foundation nor has it attacked the legitimacy of the Puerto

CIVIL 12-1032CCC                              19

Rico Legislature's objective in enacting Law No. 29.  The use by the Commonwealth of Puerto Rico of its power of eminent domain in the specific scenario of developing the Public-Private Partnership related to the Airport is but a means to accomplish the goals of Law 29 which are fulfilled in the creation of this particular PPP.  After all, for the Act to be successful in achieving its intended public purpose and goals, the State must assist in the development of particular public-private partnerships by exercising, when necessary, its power of eminent domain.  It becomes part of a whole, a spoke of the wheel.

The argument that this is a purely private taking has no factual support.  As in the case of the Hawaii Legislature, the statute enacted by the Puerto Rico Legislature does not benefit a particular class of identifiable individuals.  As a matter of fact, Law 29 does not identify any particular individuals, groups or businesses that could qualify as contracting parties with a given governmental entity to create and establish a Public-Private Partnership within the statutory/administrative framework and controls of Law 29.  The power of eminent domain was used by the Commonwealth of Puerto Rico as a means to accomplish the objectives of the Public-Partnership Act in a real world setting, that is, in the creation and establishment of the PPP for the Luis Muñoz Marín International Airport.  We conclude that plaintiff has failed to state a plausible claim of a violation of the public purpose requirement of the Takings Clause of the Fifth Amendment.

As to the alleged violation of the just compensation requirement of the Takings Clause, we hold, as in <u>Ochoa Realty Corp. v. Faría</u>, 815 F.2d 812, 816-17 (1st Cir. 1987) (holding that the pending eminent domain proceeding rendered superfluous claims for declaratory and injunctive relief since plaintiff would "have every opportunity to litigate the issue of just compensation in Puerto Rico's courts" and that "all that is required is that a reasonable, certain and adequate provision for obtaining compensation exist at the time of the taking"), <u>Culebras Enterprises Corp. v. Rivera-Ríos</u>, 813 F.2d 506, 512-13 (1st Cir. 1987) (same), and <u>Marietta Realty, Inc. v. Springfield Redevelopment Authority</u>, 902 F.Supp. 310, 313 (same), that this matter is not ripe for adjudication since the Commonwealth of Puerto

Rico has a pending expropriation proceeding in which it has deposited over $25,000,000 as estimated just compensation for the taking of the rights stemming from the lease agreement with CAF and the rent credits.

For the reasons stated, the Motion to Dismiss (**docket entry 11**) is GRANTED due to plaintiff's failure to state any plausible claim regarding the constitutional violations allegedly committed.

SO ORDERED.

At San Juan, Puerto Rico, on April 4, 2013.

S/CARMEN CONSUELO CEREZO
United States District Judge